Here, you can see Marianne Dukin for the public spelling for this course in AP. And they played the course, and then I got the request to actually explore the website. It's actually the same class. I think the first layout is simple. It's just a new one here. It's just first time development. The case of the missing words can be scored a couple times, but only the second time. And the environmental statement that you need to rely on is a lot of different changes that were made in 2011 pursuant to this class prior to the environmental statement. It's 12 years old. It's from 2004. This is the Caring Expansion Protocol that involves vulgar blogging and spamming wetland experiences within the city of Ashland's waters. And at the time, the original EIS was issued in draft quarter of 2003. The Environmental Protection Agency noted that the expansion would accelerate the delivery to the creeks that emerged from the Great Barrier Reef, which had a significant lack of sufficient information and information. But you notice that I'll show you that there are five different areas. There's actually more than one, but that's what was indicated in what we carried through on this year. Questions exist on the final paper. OK. On part of the historical basis is the fact that the Aquatic Cultivation Strategy guidance, which you need to rely on in the environmental statement, was then validated by this court in 2007 in the Pacific Coast Regional Federation case at the Great Barrier Reef. And there's actually a key point of discussion that's usually only recent. If you're aware of, you can submit to the site if you get that. I'll show you the notes. One of these forest coalition versus U.S. Forest Service talks is just based on the NMDH. And it's from the Western District of Washington, TSA. And the point is that this report came specifically made on this court. But it has a very detailed analysis of the exact same situation. There was a tender sale environmental assessment that relied on the old NMDH 35 contribution strategy and that was rejected on this board in the PCS case. And the problem with the NMDH was that it told the Forest Service, you don't have to address the PCS guidelines on a specific basis. So when this court threw that guidance out in 2007, the old rule was that you just had to stay a little bit forest-based. And the problem is that you do have to address the PCS on a specific level in a NMDH document. I also think that if you end up in the Olympic Forest case, the challenge will be that you're not going to meet the circumstances, which means to the public, I think it's common to do that. But rather, you're going to supplement the information in your court, which is what the NMDH did. The Forest Service did not address the NMDH in its decision for the transition in 2003 or 2004. Actually, at the time the EIS was issued in 2004, they were relying on the NMDH. So I think there is some confusion because there were earlier EIS reports, but this was an extra plan. And when they first started looking at a potential relationship, the EIS was an attempt at the type of specific rule that they were supposed to work with. Then the Forest Service changed the guidance illegally and relied on that more and more in the NMDH, including the 2004 EIS specific case. The second, I think, is not the EIS rule. I think the EIS rule is the attempt of the NMDH to form a supplemental case. That's a good answer. And I know that is not the case because even before this court ruled in 2007 on the prior case, my client started writing to the Forest Service saying, hey, I know it's a new solution that's coming to us in the many, many years since you gave your EIS. In May 2007, we wrote to the Forest Service and said, the court has just rejected, thrown out, invalidated the EIS guidance. So now that you are writing a new supplemental case because the court's ruling on the prior case, we're trying to get all the receptionist information out of the NMDH. Instead, they show us to narrow the receptionist and suggest that she's addressing the court's 2007 opinion and then address the other issues in a separate, non-news document. And that's an interesting question because when we look at the case, when we look at Mr. Lipscomb-Washington's court ruling, well, it's not really new information. It's a change. It's a clarification for a law. A law that's certain. The law is certain that they were supposed to address the ETS at a site-specific level. But for a certain period of time, they were ignoring that law. But that said, it's a change in circumstance that requires supplemental ETS. So this is a change. And a change in a law or a fact is a law. It's the same thing as ETS. It's not the ETS. It's the court ruling. It's not the ETS. The, what I would say is the strongest issue is the loss of this. Yes. There's something wrong, actually, with the draft, with the 2003 draft. And I don't know if that's true. I don't know. What happened was in the 2003 draft, it did address a specific issue. In fact, it may have acknowledged in regards to the environment and the things, the fact that we live in a compact native Navy, a lot of conservations between 2007 and 2004, I mean, it took all that information from the document. Well, the draft is only a draft. I mean, it requires, the draft is actually a, I don't know if it's in the title, if it complies more fully with NEPA. I'm sure it probably is. You can see it's offered. It's in the document. It did not comply with NEPA. And so, it's changing a lot of things, a lot of disclosure. So, in addition, the APS requires not only to handle all of this, but also disclosure to the public and more clarity to the directorial system. In the 2003 draft, they brought the bar change, which means that there's 40 pages of information for technical terms. So, what's the process of that? How does it work? Well, let me explain. It's really invisible. So, in the 2003 draft, it states that we're concerned about a loss to the directory system and concerning that it's not enough information about that. In that case, almost every time it's the NEPA, they go to the comments, the responses to that, and keep on filing it. You know what? You're my APA. Here's your information. And then, the file becomes a shared document. That's the whole point of the NEPA. It's disclosed. It's not something that's taken yet first. So, what are the terms of use? So, the terms of use, the terminology is used in the draft. So, it's comments. It's filed. And then, you have the reference. It's precious information. So, what are the reasons for sticking on this particular issue? So, I don't want to abuse the time, but do you think there's some kind of regulatory interest in this? What's the situation? I think we could do that. I think it's an early idea. So, what do you expect to see out of this? Do you have more of an interest in it? Well, I understand that concern, and it comes up a lot in NEPA cases, because NEPA's kind of frustrating because it simply does not require protection of the environment. It only requires disclosure of the original text. But the theory being that that final document, which comes before the record of decision, that's the document that the decision makers are going to review and say, okay, I exceeded in depth, and now I show this decision. And I agree with that, but I'm curious if maybe decision makers don't review the final document. Maybe they only look at the draft, or maybe they look at both of them. Thank you. I'll jump back in. I mean, it's kind of an odd situation for an agency to collect something in the draft and then take it back and revise it. I don't know if this is a question for review, but it does not protect the environment. It only requires disclosure. But the point being that it's an action-forcing law that, in theory, over time is supposed to lead to better decisions. And the final document should be allowed to violate NEPA where the draft didn't, and that would be to undermine the purpose of NEPA. I think that's an excellent explanation. There is some reference to animation that states that. But just a quick round of what's undisputed, that that reference to animation had expired in June of 1999, and that this project will undisputedly affect developers. And the enforcers promised that we will continue with new NEPA and with our new reference to animation in 2012. They said that in 2011, in our NEPA system. But when they came out with their further documentation in 2012, in 2013, 2014, there hasn't been any work in this relationship. There's a funding team that has decided in the briefs that it's incompatible for agencies to make a decision first and to be in the process later. So, you know, where they want to finish. But that's a new way for references. If here's where they are, then they'll know better what the impacts of the project are. As you see, if you're going to a different level, then the private party will be more prepared to do that. Seconds off. Okay. I'm going to stop it with that. I just want to say, I thought at the time that this was the critical work time, and I wish I would have known that. But also, I can't do anything to make sure it gets funded so much that it's what the real world impact is. Oh, I see what you're saying. Yeah. The private party has to do the simulation. The private party can only do the reference simulation if they're applying for a permit. It's sometimes, you know, before it does, you know, you get what you're going to do, but you do it in a larger space. But here, of course, we are going to do a reference simulation, which is going to do everything before we do that. But we don't know how to do it before. That's right. In the case of... Yeah, that's what I was going to say. The private party can do the simulation if they're applying for a permit. But the simulation is chosen where the references are. So, then we can tell that our report, that's what we're going to do studying those references, which is a permit. So, while we're in time, it's important that they should be, but we don't need, for the permit, to analyze and test. The permit process itself is going to have, it's not going to be meaningful to put it on a permit. And so, a lot of times, if they don't get a very good result, we will gather in a very large project and do the permitting and be happy about it. Yeah. But here, if they trust us, here's where anybody else is, we don't really know what the best way to do the simulation is. We'll figure it out later and we'll get a permit. That's what the private party does. Yes, thank you. Good morning. Thank you. I'm Robert Walton. I'm the person in charge of the service. I'm going to give you 15 minutes if you'd like to be in a room so you can have a chance to speak. Thanks. I'll start out with you, I'm the person in charge that is in charge of the northwest forest plan. And that forest plan is part of the National Forest Management Act. In Alaska, it's Section 3. The plan does argue that foresters have to help with science, technology,  environmental support, and core health in any violation of the National Forest Management Act. And so, we're going to do this as you've heard in the brief here. I'm sorry to interject, but it's important. In 2003, the forestry agency, the forestry agency where you can see me, there's a clear way to trace the course of this process. The person who actually did the work and the technology and the draft in 2003, who I don't know if you've ever seen it, there, with the authority of the Forest Conservation Strategy, tried to furlough what was required. And, the plan analyzes all the objectives of the section of the forestry agency. And, it's not just that the plan analyzes all the objectives, but also just analyzes the watershed impacts, the wetland impacts, the riparian impacts, not just the format of the projects, but, you know, what were those projects and to those areas and, you know, what kind of impacts they had. Then, a year later, when the final draft is issued, the agency is no longer bothered. And, so, the agency is no longer going to hear that bothered section. But, it's taking longer to commission documents, discussions, intros, and all the introductory areas that fall in the actual robust two-past-four discussion. Past-four is for greenhands for mostly issues related to agriculture. Also, classification of riparian reserves. And, of course, there is some supplemental records issued following appropriation along with supplemental environmental records that you go through each of the chapters one-by-one all the time. It says, here's where you can see the environmental health issues. You take that full brochure and this is the problem that the agency has to address. And this is    agency has to address. And just one more point on this. We're here an hour ahead, but we still have millions of issues, and we're most concerned about environmental health issues and environmental health issues. The second issue I'll turn to is climate mitigation. I'm sure that most of us have experienced climate mitigation for over two years. There's analysis about what it has. The only change that we see is not a change in the weather, not a change in climate, but rather that five years past since the first level of insolation before it expired. So that means the Forest Service International and the National Institute of Human Resources have been doing that insolation for a quarter of a year. Four years. They actually need that for the process. And it doesn't make sense to tell you the cost of expiring without the common ground interests and willingness in this institution. What is very clear from the record is there will have to be a new level of insolation. There will have to be  new level of insolation. There is no new data on the ground interests as far as that's concerned. There are three other issues that are up on the street. The total mass of the new population over   three years, the population over the next three years, the total mass of the population over the next three years. The total mass of  population over the next   out of the oldest population in the family. The oldest population in the family. If your value is more than $1,000,000, you have a separate information and there's no explanation why all the information has to be provided to them. They don't even have to go out and look to find out if it should be sent them, I think, five different obscene letters from 2007 to 2011 with this information. Thank you.
judges: Thomas, Clifton, Nguyen